**H. W. MARTENS and Robert A. Maurin, Jr., Appellants,**

**v.**

**Carl F. BARRETT, B. C. Furcell and The Texas Company, Appellees.**

**No. 16450.**

United States Court of Appeals Fifth Circuit.

June 10, 1957.

Amos L. Ponder, Jr., New Orleans, La., Louis J. Ourso, Jr., Henry A. Mentz, Jr., Hammond, La., for appellants.

Amzy B. Steed, New York City, Hugh M. Wilkinson, C. Ellis Henican, New Orleans, La., Milton Handler, New York City, Oscar John Dorwin, Stanley D. Robinson, New York City, Jack D. Childers, Houston, Tex., Joel C. Coleman, New York City, of counsel, for appellees.

Before BORAH, RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

■ Because, to the District Court, it was uncontradicted that the operation of the service station was wholly that of the incorporated company M & M Corporation, and not that of its sole stockholders who sued as individual plaintiffs, the complaint for treble damages under the Anti-trust Acts jointly against The Texas Company, the Lessor-Seller and its local consignment distributor, was dismissed on summary judgment since the plaintiffs were not injured in their business or property whatever damage might the corporation have sustained.

We agree. And so doing, this makes it unnecessary to pass upon the contentions of The Texas Company that refusal to reconduct [1] the lease of its filling station for a third year, even though motivated, as alleged, as a reprisal for the plaintiffs' objecting to stocking and selling a particular manufacturer's line of TBA (tires, batteries and accessories) could not violate the Anti-trust laws since a single manufacturer is entitled to select its customers or dealers as it alone sees fit,[2] or the contrary rival claim of plaintiffs that, in its operations, the lease was but a form of restrictive dealer restraints elsewhere condemned.[3]

1. The lease, effective June 1, 1952, covered a service station owned by The Texas Company at 311 West Thomas Street, Hammond, Louisiana. The term was for a period of one year ending May 31, 1953, "and thereafter, from year to year, subject to termination by either party at the end of the first year or any subsequent year on ten (10) days prior written notice." Absence of such notice in May 1953 reconducted, i. e., renewed it, for another year. On May 14, 1954, The

Texas Company, gave the notice terminating the lease May 31, 1954.

2. The Texas Company and its distributor press heavily our cases: Nelson Radio & Supply Co. v. Motorola, 5 Cir., 200 F.2d 911, certiorari denied 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356; Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268, certiorari denied 348 U.S. 821, 75 S.Ct. 34, 99 L.Ed. 648.

3. The plaintiffs rely on Standard Oil of California v. United States, 337 U.S. 293,

A claim for treble damages, as is this one, originates in Section 4 of the Clayton Act, 15 U.S.C.A. § 15. By it, this punitive sanction in enforcement of the statutory Anti-trust policy, is limited to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." A corporation is a "person," 15 U.S.C.A. § 12. And it is universal that where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its [4] stockholders (few or many), officers, directors, creditors or licensors, who has a right of recovery, even though in an economic sense [5] real harm may well be sustained as the impact of such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership.

And yet, on really undisputed facts, that is what Martens and Maurin sought below. To be sure, the lease and collateral sales contract with The Texas Company was with them as individuals and contained a condition forbidding assignment without consent (but which could not be unreasonably withheld). And, for our purposes, the operations from June 1, 1952 to September 15, 1952 may even be treated initially as a partnership activity. But on that date, under specific advice of competent Louisiana counsel

who cautioned them that continued operations of this filling station and another business (garment factory) just recently acquired exposed them, and their personal estates, to unlimited and possibly spectacular liabilities, they created the Louisiana Corporation, M & M Corporation.

The articles of incorporation declaring the objects and purposes for which the corporation was "organized and the nature of the business to be carried on by it" specified with precision the purpose to operate a garment factory and, here important, "to own, lease or operate a General Service Station Business * *." And, significantly, the registered office, required by Louisiana law, was described as "311 West Thomas Street, Hammond, Louisiana" which was, of course, the service station owned by The Texas Company and leased to the plaintiffs " * * * primarily for the operation of a gasoline service station and the sale of automobile accessories * * * ."

When it was set up, everything was done to put the operation under the corporation. The inventory and equipment which Martens and Maurin had acquired from the predecessor lessee of the station was transferred at the original cost (approximately $3000) and credited to Martens' capital account against his stock subscription. Subsequently each contributed further cash in payment of their

69 S.Ct. 1051, 93 L.Ed. 1371; Richfield Oil Corp. v. United States, 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1334; Lorain Journal Company v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162.

4. Peter v. Western Newspaper Union, 5 Cir., 200 F.2d 867, 872; Coast v. Hunt Oil Co., 5 Cir., 195 F.2d 870, certiorari denied 344 U.S. 836, 73 S.Ct. 46, 97 L.Ed. 651; Productive Inventions v. Trico Products Corp., 2 Cir., 224 F.2d 678, 679, certiorari denied 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818; Gerli v. Silk Association of America, D.C.N.Y., 36 F.2d 959, 960; Westmoreland Asbestos Co. v. Johns-Manville Corp., D.C.N.Y., 30 F. Supp. 389, affirmed on opinion below 2 Cir., 113 F.2d 114.

5. To illustrate the status of the persons, e. g., officers, directors, creditors, landlords, licensors, etc., who have no individual right of action and the types of damages sustained by them through conspiracies affecting a corporation, e. g., lost profits, impairment of stock value, loss of royalties, loss of sales, reduction in percentage rent, etc., the following are a few, out of many, cases: Harrison v. Paramount Pictures, Inc., D.C.Pa., 115 F.Supp. 312, affirmed per curiam 3 Cir., 211 F.2d 405, certiorari denied 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653; Loeb v. Eastman Kodak Co., 3 Cir., 183 F. 704; Walder v. Paramount Publix Corp., D.C. N.Y., 132 F.Supp. 912; Melrose Realty Co. v. Loew's Inc., 3 Cir., 234 F.2d 518, certiorari denied 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85.

outstanding stock subscriptions totaling $11,000. The books of account reflect that such capital contributions were used to purchase and pay for current inventories, supplies and equipment for the service station and to finance the accounts receivable from the station's customers. Detailed accounting records show that all income from operations comprising sales of gas, oil, lubrication, candy and drinks, accessories, grease and mechanics' labor was attributed to the corporation. And offsetting such corporate income was the cost of inventory of gas, oil, candy, lubricants and accessories sold, and operating expenses, equally detailed, comprising labor, office supplies, bad checks, cash shortage, repairs, advertising, taxes, dues, utilities, telephone, licenses, insurance, bad debts, and the like. Of acute significance was the fact that the salaries and compensation for Martens and Maurin in the actual operation and supervision of the station was likewise paid by and treated as a corporate obligation.

And, to cap all of this, adopting a fiscal year coinciding with the lease period (June 1 to May 31), the corporation, by sworn federal income tax return for each of the two years signed by its President Maurin "under the penalties of perjury", answered the inquiry on Form 1120 "Principal business activity" as "service station" and "filling station" respectively, and then reported all of the income and expenses of the service station as that of the corporation. Included as scheduled deductions was the compensation of the officers Martens and Maurin, depreciation on equipment including that transferred at time of incorporation and, the operating expenses detailed above, comprehending such vital operational matters as bad debts and bad checks. All of this was expressly related back to June 1, 1952, so that the parties, and their corporation, treated it as a corporate activity from its inception.

Keyed to this, though filed on a calendar year basis, were the personal federal income tax returns of Martens and Maurin which reported as income to each of them the compensation paid, or payable, by the corporation and deducted by it as an expense. Consistent with this pattern, no partnership return of any kind was filed and in no personal return did either of them take, as deductions, any of the operating expenses, depreciation, etc., claimed by the corporation.

And if, in the face of this staggering record, there were any possibility of contrary inferences, they were categorically destroyed by the articulate, positive admissions of the parties themselves, each an officer and director, the most emphatic [6] of whom was the president himself.

The fact that in bank accounts, insurance policies, purchase accounts or the like, the name "M & M Service Station" might have been used is of no importance and raised no questions of fact. The trade name was, first, almost identical with the corporate name. But, in any event, when in all decisive respect, such as the treatment of income, expenses, de-

---

6. Maurin testified on pre-trial discovery:
"Q. * * * Every cent that either you or Martens got out of that service station business in those two years went into the corporation as receipts and came out of the corporation either as salaries or additional salaries, didn't it. Answer yes or no and if you have to explain, alright. Do you understand the question?
* * * * *
"A. What you say is true for the simple reason it shows right here.
"Q. Alright—I just want you to admit it, that's all. A. I mean I can't deny it for the simple reason I filed my income tax on that basis.

"Q. And without taking you over the items, item by item, can we agree on the proposition that in both years of the operation of that service station under the Texas Company's lease, that all receipts of the station eventually went into the consolidated balance sheets of the corporation, and all withdrawals by you or Martens came out of the receipts of the corporation and were charged as corporate deductions on the tax return? A. It shows up that way in the final analysis.
"Q. You admit that? A. Yes, how could we deny it."

termination of profits, losses, return and payment of taxes, the business was in fact conducted as a corporate entity, inaccuracy or carelessness, inadvertent or purposeful, in the description in the name of the business would be quite immaterial. The sale and delivery of petroleum products by The Texas Company or its distributor consignee and the insistence (assumed in testing summary judgment) that, notwithstanding the intervening incorporation, purchases would have to be billed to the two as individuals who would remain personally liable for them, adds nothing. A corporation may purchase its goods direct or through an agent (Martens and Maurin). Corporations, especially small closely held ones, frequently find that persons dealing with them require personal guaranties of controlling stockholders. The important thing was—what was done with the petroleum products? The answer to that is absolute: M & M Corporation, a corporation, sold them.

That disposes also of the contention that since the lease forbade assignment without consent, and Texas Company had never given such consent, it cannot assert that the operation was by a corporation. The controversy of this lawsuit was not the property rights under the lease, or whether it could or could not be assigned, or the effect of a *de facto* assignment. The lawsuit was that in the operation of the service station practices and actions of the defendants, monopolistic in nature and in restraint of trade, *wrongfully* damaged the *person* operating the station. And *who* was that person—whether Martens and Maurin individually or the corporation—depended not on the technical legal right of that person to possession but on the actual *fact* of the operation which is here uncontradicted.

 Nor can this be twisted into some sort of estoppel as claimed.[7] For if The

Texas Company knew of the intervening incorporation (it denied this), it took no action which either stopped the plaintiffs' activities or led them to change positions. Whether The Texas Company did, or did not, know, or knowing did or did not object, the bald fact remains that the actual operation by M & M Corporation, as a corporation, went uninterruptedly along with neither representation, reliance nor detriment, the essential ingredients of estoppel, Sinclair Prairie Oil Co. v. Campbell, 5 Cir., 164 F.2d 907; Unterweser Reederei Aktiengesellschaft v. Potash Imp. Corp., 5 Cir., 36 F.2d 869.

The claim of the corporation was not before the court. All that was there presented and ruled on was the claim of Martens and Maurin individually. Since it was the corporation, if anyone, who had a claim, there was on this crucial issue no dispute whatsoever on the fact and summary judgment was clearly right. Bruce Construction Corp. v. United States for Use of Westinghouse Electric Supply, 5 Cir., 242 F.2d 873.

Affirmed.

---

7. The plaintiffs rely strongly on: Lever Bros. Co. v. Atlas Assur. Co., 7 Cir., 131 F.2d 770; White Star S. C. Co. v. North British & Mercantile Ins. Co., D.C.Mich., 48 F.Supp. 808; Daly Bros. Shoe Co. v. H. Jacob & Sons, D.C.Pa., 49 F.Supp. 118; Hertz v. Record Pub. Co. of Erie, D.C.Pa., 105 F.Supp. 200, affirmed 3 Cir., 219 F.2d 397, certiorari denied 349 U.S. 912, 75 S.Ct. 601, 99 L.Ed. 1247.