### INDUSTRIAL INVESTMENT DEVELOPMENT CORPORATION, et al., Plaintiffs-Appellants,

v.

### MITSUI & CO., LTD., et al., Defendants-Appellees.

### No. 81–2175.

United States Court of Appeals, Fifth Circuit.

March 31, 1982.

Louis Paine, Robert Hayden Burns, Fitzhugh H. Pannill, Jr., Houston, Tex., for plaintiffs-appellants.

B. J. Bradshaw, Rufus Wallingford, Jerry E. Smith, Daniel M. McClure, Houston, Tex., for defendants-appellees.

Before COLEMAN, REAVLEY and SAM D. JOHNSON, Circuit Judges.

REAVLEY, Circuit Judge:

This is an antitrust suit. The district court initially granted the defendants' motion for summary judgment on the single ground that the action was barred by the act of state doctrine. We reversed. 594 F.2d 48 (5th Cir. 1979), *cert. denied*, 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980). On remand, the district court turned back to the same motion of the defendants and granted summary judgment on the three remaining grounds: (1) that defendants' conduct is beyond the extra-territorial scope of the antitrust laws; (2) that plaintiffs have no standing to sue under the antitrust laws; and (3) *forum non conveniens*.[1] The court declined to exercise pendent jurisdiction over plaintiffs' nonfederal claims, and dismissed the suit.[2] Defendants

---

1. The defendants and the court below considered these three to be four grounds for summary judgment, as we also listed them in our prior opinion. *See* 594 F.2d at 49 & n.2 (expressly reserving decision on these grounds).

As will be seen, however, we consider two of those grounds under the single issue of standing.

2. Because we reverse the district court's deci-

were not entitled to summary judgment on any of the grounds they invoked. We again reverse and remand.

## I. *Background*

The plaintiffs are an American corporation, Industrial Investment Development Corporation ("Industrial Investment"), and its two Hong Kong subsidiaries, Indonesia Industrial Investment Corporation, Ltd. ("Indonesia Industrial") and Forest Products Corporation, Ltd. ("FPC"). The defendants-appellees are a Japanese corporation, Mitsui & Co., Ltd. ("Mitsui-Japan") and its American subsidiary, Mitsui & Co. (U.S.A.), Inc. ("Mitsui-U.S.A."). A third defendant is an Indonesian corporation, P. T. Telaga Mas Kalimantan Company, Ltd. ("Telaga Mas"), which was served but has never appeared in this action.

Plaintiffs claim that the three defendants conspired to keep plaintiffs out of the business of harvesting trees in East Kalimantan (Borneo), Indonesia and exporting logs and lumber from Indonesia to the United States and other countries. Plaintiffs allege that defendants' conspiracy was intended to and did unreasonably restrain and monopolize the foreign commerce of the United States, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[3] Plaintiffs also claim that the two Mitsui defendants are liable for tortious interference with contractual relations. In our prior opinion, we detailed the plaintiffs' allegations concerning the defendants' efforts to deprive plaintiffs of their alleged contractual rights to a timber concession in East Kalimantan. *See* 594 F.2d at 50. We will not repeat those allegations here. We think it useful for the purposes of this appeal, however, to outline the procedural history of this case.

On June 19, 1975, plaintiffs filed their complaint in this action, along with a set of interrogatories and a document request addressed to Mitsui-U.S.A. Response to the interrogatories and document request was made on October 1, 1975. On July 6, 1976, plaintiffs served a set of interrogatories and a document request on Mitsui-Japan, which did not respond until April 27, 1977. One month later, defendants served their motion for dismissal and summary judgment on grounds of standing, subject matter jurisdiction, and *forum non conveniens.* After replying to defendants' voluminous motion papers on October 11, 1977, plaintiffs attempted to continue discovery. On November 4, 1977, plaintiffs served notice that they would take the deposition of Mitsui-Japan on December 15 in Houston, Tex-

---

sion concerning the antitrust claims, once again we do not reach the question whether the district court has diversity jurisdiction over plaintiffs' nonfederal claims under 28 U.S.C. § 1332(a)(3). *See* 594 F.2d at 49 n.3. We also note that our reversal in this case vacates the district court's refusal to exercise pendent jurisdiction over the nonfederal claims. Contrary to the baseless argument made by defendants after the first remand, neither our prior opinion nor this one establishes as "law of the case" that pendent jurisdiction was properly declined.

**3.** Section 1 of the Sherman Act, as amended, provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thou-

sand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1 (1976). Section 2 of the Sherman Act, as amended, provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2 (1976).

Plaintiffs also alleged that the conspiracy was intended to and did restrain free competition in and increase the price of articles imported into the United States, in violation of § 73 of the Wilson Tariff Act, 15 U.S.C. § 8. Since neither party has discussed this claim either below or on appeal, we express no opinion on it.

as. After securing a postponement, Mitsui-Japan moved for a protective order on January 6, 1978, asking the court to stay all discovery on the ground that it had filed a dispositive motion and that "the questions raised in said motion are questions of law rather than questions of fact and involve, primarily, the insufficiency of plaintiffs' legal theories under the facts as alleged by them."[4] Responding to this motion, plaintiffs argued that it was "especially inappropriate" to stay the deposition of Mitsui-Japan while a summary judgment motion was pending, since plaintiffs were entitled to discover evidence establishing the existence of genuine issues of material fact.

The district court did not rule on the stay of Mitsui-Japan's deposition; it granted summary judgment on the act of state ground on February 28, 1978. This court's mandate reversing that judgment was not issued until September 4, 1979. When plaintiffs attempted to resume discovery by serving a notice of deposition of Mitsui-U.S.A. on September 7, 1979, defendants filed

another motion to stay all discovery pending the court's resolution of the remaining grounds in its motion, again averring that "the issues raised are questions of law rather than questions of fact and involve, primarily, the insufficiency of plaintiffs' legal theories under the facts as alleged by them." After this motion and two others were denied in November and December of 1979,[5] Mitsui-U.S.A. produced employees for deposition in December. Then, on March 7, 1980, plaintiffs filed a motion to compel discovery, asking the court to resolve the issues concerning the deposition of Mitsui-Japan and also contending that Mitsui-U.S.A. had failed to present for deposition representatives with knowledge of the matters involved in this litigation.

 Thirteen months later, without resolving any of the outstanding discovery issues, the court again granted summary judgment against plaintiffs. The court explained only that it found "[t]he arguments in Defendants' briefs" to be "meritorious" and "dispositive."[6] Although the action

4. Mitsui-Japan also argued that its deposition should be taken in Tokyo "or in the home cities" of the witnesses it designated as its representatives and that plaintiffs should be required to deposit $25,000 with the court to cover the costs of the deposition. We express no view as to how the district court should have resolved these contentions.

5. After the motion for a stay of all discovery was denied, defendants moved for a protective order which would exclude from Mitsui-U.S.A.'s deposition most of the matters listed in plaintiffs' notice of deposition solely on the ground that the matters were not "reasonably calculated to lead to the discovery of admissible evidence," Fed.R.Civ.P. 26(b)(1). Defendants offered no explanation why the matters listed were not relevant, and the matters were, at face value, plainly relevant. The district court denied the motion on December 7. Shortly before the deposition was to commence, defendants filed another motion, this time in the United States Supreme Court, asking for a stay of the deposition pending the Court's disposition of defendants' pending petition for a writ of certiorari. In their motion papers, defendants alleged that the witnesses for the deposition would have to travel from great distances; yet, the witnesses Mitsui-U.S.A. actually produced were located in Houston. The Supreme Court denied defendants' motion after the deposition had begun.

6. In addition, the court granted summary judgment on a ground never advanced in defendants' briefs. Noting our prior decision that this action was not barred by the act of state doctrine, the district court held, without elaboration, that the action was barred by the "state action" doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and the political free speech doctrine of *Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137–38, 81 S.Ct. 523, 529–30, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). This holding was clearly in error. We express no opinion, however, on whether the *Noerr-Pennington* doctrine would protect a person's petitions to a foreign government to take certain action. This issue was not briefed here or below. We do note that defendants' efforts to influence the actions of Telaga Mas are not protected by the *Noerr-Pennington* doctrine, just as they were not protected by the act of state doctrine, simply because they later resulted in government action. Defendants have pointed to no acts of petitioning the government in the *Noerr-Pennington* sense. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707–08, 82 S.Ct. 1404, 1415, 8 L.Ed.2d 777 (1962) (explaining *Noerr*).

had been pending for almost six years, plaintiffs had not been allowed to depose one of the defendants, and claimed that the deposition of the other was insufficient. Almost four years had been consumed by defendants' motion for dismissal and summary judgment and their attendant efforts to resist discovery on the ground that resolution of the motion could render further discovery unnecessary.

## II. The Extraterritorial Scope of the Sherman Act

### A. Effect on United States Commerce

■ A restraint that directly or substantially affects the flow of commerce into or out of the United States is within the scope of the Sherman Act. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 704, 82 S.Ct. 1404, 1413, 8 L.Ed.2d 777 (1962); United States v. Aluminum Co. of America, 148 F.2d 416, 443–44 (2d Cir. 1945) ("Alcoa"); 1 J. von Kalinowski, Antitrust Laws and Trade Regulation § 5.02[2][c] (1980); L. Sullivan, Antitrust 714–16 (1977). A review of the summary judgment submissions and evidence convinces us that defendants have not demonstrated that there is no genuine issue concerning the existence of a direct or substantial effect on United States foreign commerce. See Fed.R.Civ.P. 56(c); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970) (burden on movant).

In their briefs prior to the first appeal, defendants' attack on the existence of an effect on United States commerce was only an attack on plaintiffs' pleadings. Defendants placed their own characterization on the complaint and declared that the case involved only the tree-cutting business in Indonesia; thus, they concluded, their conduct had no effect on United States commerce. Plaintiffs had alleged, however, that Mitsui-U.S.A., an American corporation which imports a sizeable amount of lumber or lumber products into the United States, had conspired to keep them out of the business of harvesting trees and exporting logs and lumber from Indonesia to the United States. There was ample evidence in the record to show that Mitsui-U.S.A. had appropriated much of the business that plaintiffs claim they would have derived from the forestry concession: Mitsui-U.S.A. was purchasing the bulk of the logs from the concession and selling them for export to Mitsui-Japan at a substantial profit.

■ The competition between two American importers to obtain a source of supply on foreign territory affects the foreign commerce of the United States. Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 604–05, 615 (9th Cir. 1976); see Pacific Seafarers, Inc. v. Pacific Far East Line, Inc., 404 F.2d 804, 811–17 (D.C.Cir. 1968), cert. denied, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969); cf. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 113 n.8, 89 S.Ct. 1562, 1571 n.8, 23 L.Ed.2d 129 (1969) (American corporation's participation in foreign patent pools); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (division of foreign markets by American corporation and its foreign affiliates). Mitsui-Japan was allegedly a co-conspirator in this attempt to restrain competition between two American competitors. Thus, defendants' attack on the pleadings did not make it "appear[ ] beyond doubt that the plaintiff [could] prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (motion to dismiss for failure to state a claim), quoted in McLain v. Real Estate Board, 444 U.S. 232, 245, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980) (challenge to "jurisdictional element" of a Sherman Act claim).

■ After we reversed the district court's first grant of summary judgment, the defendants shifted to a factual attack by arguing that the single, undisputed fact that Mitsui-Japan exported all of the lumber, purchased from Mitsui-U.S.A. in Indonesia, to Japan demonstrated that there was no genuine issue concerning an effect on United States commerce. Mitsui-Japan argued—and this is the argument it ad-

vances most strenuously in this court—that when a Japanese business competes with an American business in Indonesia and exports the fruits of that competition solely to Japan, any effect on United States commerce is purely incidental, indirect, and unintentional. Even if defendants' argument is correct—an issue we do not reach—it ignores the allegations in this case. Here, an American corporation with an interest in protection of its import business has allegedly conspired to eliminate a potential American competitor in both the business of purchasing logs in Indonesia and the business of importing lumber and lumber products into the United States.

██ Defendants' showing did not demonstrate that there was no genuine fact issue for the simple reason that defendants' showing was not responsive to plaintiffs' allegations. That one co-conspirator—Mitsui-Japan—followed a course of business action that, in isolation, might not be considered a violation of the United States antitrust laws does not demonstrate either that the effect of the conspiracy as between the American competitors is not an effect on United States commerce or that the intent of the conspiracy was not to restrain competition between the American competitors. "[S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading

roles [and] the proof is largely in the hands of the alleged conspirators . . . ." *Poller v. CBS, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Summary judgment is even less appropriate here, where there is ample evidence of a conspiracy to keep plaintiffs from becoming a competitor, and plaintiffs have not had an opportunity to depose one of the conspirators on the effect and intent of their efforts.

### B. *Comity and International Conflicts*

██ A district court should not apply the antitrust laws to foreign conduct or foreign actors if such application would violate principles of comity, conflicts of law, or international law. *See Alcoa*, 148 F.2d at 443; 1 J. von Kalinowski, *supra*, §§ 5.03 & 5.04. The act of state doctrine, which we rejected as a defense to this suit in the prior appeal, is an example of a principle of comity which, when applicable, prevents the court from entertaining a claim. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416–27, 84 S.Ct. 923, 934–40, 11 L.Ed.2d 804 (1964). Like the act of state doctrine, the question whether any other principle of comity, or of international law, or any conflicts of law analysis prevents the district court from entertaining the suit is a question of law which is fully reviewable by this court on appeal.[7]

7. Several recent court of appeals decisions have proposed a conflict of laws analysis for determining whether the district court should entertain an antitrust claim involving extraterritorial conduct. *See Timberlane Lumber Co. v. Bank of America*, 549 F.2d at 613–15; *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1297–98 (3d Cir. 1979); *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1253–56 (7th Cir. 1980). We commend their analysis, but we note that there has been some debate concerning the nature of the inquiry established. In a concurring opinion in *Mannington Mills*, Judge Adams argued that the test established in *Timberlane*, the leading case in this line, is a test of subject matter jurisdiction. *Mannington Mills*, 595 F.2d at 1299–1301. *See generally Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1161, 1171–77 (E.D.Pa.1980). Like the Third Circuit majority and the Seventh Circuit, however, we do not read the *Timberlane* balancing test as a test of subject matter jurisdiction. *Compare*

*Timberlane*, 549 F.2d at 602 (recognizing the rule that case should not be dismissed for lack of subject matter jurisdiction unless allegations are frivolous), *with id.* at 615 (concluding that plaintiffs' allegations of effect were sufficient to bring the case "within the jurisdiction of the federal courts," but remanding for further consideration of whether that jurisdiction should be exercised). Perhaps the confusion is a result of the use of the term "jurisdiction," which can have a number of meanings. But the meaning of "subject matter jurisdiction" in federal law is established by *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). *See Green v. Ferrell*, 664 F.2d 1292, 1294–95 (5th Cir. 1982). The wide-ranging inquiry suggested by *Timberlane* and its progeny does not fit within *Bell*'s approach to subject matter jurisdiction.

We also disagree with the suggestion in *In re Uranium Antitrust Litigation*, 617 F.2d at 1255, that the question whether to entertain the suit is discretionary with the trial judge. A deci-

**[11]** Defendants invoke the conflicts of law analysis established in *Timberlane Lumber Co. v. Bank of America,* 549 F.2d at 613–15. But their attempt to satisfy the *Timberlane* test is a series of mere assertions, unsupported by the pleadings or by summary judgment evidence. For example, despite defendants' slightly familiar arguments, they have not demonstrated any "conflict with [the] law or policy" of the Indonesian government or any potential difficulty in enforcing a district court decree. *Timberlane,* 549 F.2d at 614. Neither the Indonesian court's nullification of plaintiffs' joint venture agreement with Telaga Mas nor the Indonesian government's action in cancelling its approval of plaintiffs' joint venture—both described in our prior opinion, *see* 594 F.2d at 50—has been shown to have been an approval of defendants' efforts to destroy the joint venture agreement or a determination that plaintiffs were not entitled to enforce their contractual rights or to do business in Indonesia. To the contrary, a second Indonesian court held that plaintiffs were not bound by the nullification order, and the Indonesian government invited plaintiffs and Telaga Mas to make a new agreement. *See id.* Moreover, the evidence in the present record more strongly supports the plaintiffs' contention that prosecution of this suit is fully consistent with the laws and policy of Indonesia because defendants' actions may have been torts or statutory violations under Indonesian law.

Defendants have demonstrated no basis for declining to entertain this suit. The grant of summary judgment on this ground was error.

### III. *Standing*

In their original motion papers, defendants argued that plaintiffs did not have antitrust standing because they were not within the "target area" of the alleged anticompetitive acts and because any injury

they suffered was merely derivative injury suffered as shareholders of other corporations. After remand, and on this appeal, defendants have argued that plaintiffs lack standing because they have not alleged "*antitrust* injury," invoking the italicized doctrine of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).[8] We deal with these contentions in turn.

### A. *Target Area*

 Section 4 of the Clayton Act grants a cause of action to "[a]ny person . . . injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. It does not list the requirements of standing. *See* Handler, *The Shift From Substantive to Procedural Innovations in Antitrust Suits,* 71 Colum.L.Rev. 1, 24 (1971). Rather, standing is a judicially created doctrine designed to foreclose recovery to some plaintiffs who, although within the literal terms of § 4, have suffered injuries that are too "remote" or "indirect." *See Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1131 (5th Cir. 1975). Simply because an element of a private antitrust claim can be traced to the language of § 4 does not, as defendants seem to believe, make that element a component of "standing." The standing inquiry involves neither "the violation issue" nor "the damages issue." *Yoder Bros. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1359–60 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977).

 What standing does involve is the application of this circuit's test for standing, the "target area" test:

> To attain standing a person (whether corporation or individual) must be one against whom the conspiracy is aimed. Or, put in plutonomic terms, the complainant must show that he is within that

---

sion not to apply the antitrust laws must be based on solid legal ground; the question is one of interpreting the scope that Congress intended to give the antitrust laws. *Alcoa,* 148 F.2d at 433. It is a question of law that is fully reviewable on appeal.

**8.** We note that *Brunswick* was decided four months before defendants first moved for dismissal and summary judgment.

sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry.

*Jeffrey*, 518 F.2d at 1131. Standing "is a preliminary [matter] to be answered *only* from an examination of the allegations of the complaint." *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 547 (5th Cir. 1980) (emphasis added), *cert. denied,* —— U.S. ——, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *accord, Yoder Bros.*, 537 F.2d at 1359.[9]

■ Plaintiffs' allegations are clearly sufficient to give them standing. All three plaintiffs allege that they were to be direct participants in the harvesting and exporting of logs and lumber products from Indonesia, and the importing and marketing of such materials in several markets, primarily the United States. They allege that defendants destroyed plaintiff FPC's rights in the forestry concession in order to keep them out of harvesting, exporting, and marketing, businesses in which both defendants are allegedly engaged. Plaintiffs have also made detailed allegations concerning their intentions and preparations to enter these proposed businesses. *See Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966).

Thus, plaintiffs have alleged that they were attempting to enter "that sector of the economy . . . endangered by a breakdown of competitive conditions"; indeed, they were the very persons "against whom the conspiracy [was] aimed." *Jeffrey*, 518 F.2d at 1131.

### B. *Derivative Injury*

Defendants have constructed a "derivative injury" argument which is in part not a "standing" argument at all but a request for summary judgment on the factual issue of injury. First, they examine the relationship between the three corporate plaintiffs: plaintiff FPC, a Hong Kong corporation, was wholly owned by plaintiff Indonesia Industrial, another Hong Kong corporation; all of Indonesia Industrial's stock was owned by two other Hong Kong companies which held the stock in trust for the American parent, plaintiff Industrial Investment. Next, defendants point out that the forestry concession was to be operated by a never-formed Indonesian corporation to be owned by FPC and Telaga Mas. Beginning their legal argument, defendants declare that the only possible restraint on commerce caused or intended by their destruction of the joint venture between FPC and Telaga Mas was a restraint on the tree-harvesting business in Indonesia. Invoking the rule that a corporate shareholder has no standing to sue for antitrust injury to the corporation, *see Martens v. Barrett*, 245 F.2d 844, 846 (5th Cir. 1957), defendants argue that FPC's only injury was as a shareholder of the never-formed Indonesian corporation; that Indonesia Industrial's only injury was as a shareholder of FPC; and that Industrial Investment's only injury was as a shareholder of its Hong Kong subsidiaries. Finally, going beyond the pleadings, defendants question Indonesia Industrial's and Industrial Investment's claims that they would be directly involved in the export and marketing of logs and lumber products.

**9.** Our writing has not always been consistent with the principle that standing is a matter to be determined only from the pleadings. In *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981), we were reviewing a jury verdict in favor of plaintiffs, two affiliated corporations. We upheld the trial court's grant of judgment n. o. v. against one of the plaintiffs because "there was *no* evidence" that defendants had caused an injury to competition in the separate market in which that plaintiff operated. *Id.* at 1362. While we termed this a determination of

standing, it was, properly speaking, a determination that plaintiffs failed to prove allegations that would have given them standing—*i.e.*, they failed to prove that they had suffered an injury within the target area of the illegal restraint. The question whether plaintiffs have in fact suffered such injury is not properly termed a question of standing. *See Yoder Bros.*, 537 F.2d at 1359–60.

As will be seen, even if we construe defendants' standing arguments as a request for summary judgment on the fact of injury, defendants were not entitled to summary judgment on this ground.

We reject defendants' argument for several reasons. First, defendants' contention that the only restraint was on the Indonesian tree-harvesting business is simply their own revision of plaintiffs' pleadings. Plaintiffs have alleged that defendants were attempting to restrain competition in the harvesting, acquisition, export and marketing of logs from Indonesia, business activities in which the defendants are allegedly involved. Defendants cannot determine the intent and effect of the alleged conspiracy by *ipse dixit*.

Second, defendants read *Martens v. Barrett* too broadly when they contend that it deprives FPC of standing to seek damages for defendants' efforts to keep it out of the harvesting business. In *Martens v. Barrett*, two plaintiffs, the sole shareholders of a corporation that owned and operated a gas station, brought an antitrust action against the station's former distributor. We held that "where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders . . . , who has a right of recovery." 245 F.2d at 846.[10] We do not question that holding; it is fully consistent with one of the purposes of the doctrine of antitrust standing: avoiding "the problems of double recovery." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972). Had we allowed the shareholders in *Martens* to recover, there would have been no assurance that the corporation would not later have sought damages in its own name. Moreover, there was no justification in *Martens* for not having the corporation bring suit.

The situation is vastly different when defendants' own actions are alleged

to have aborted the entity which defendants claim has sole standing to sue. The antitrust standing inquiry is not a search for labels; it is a search for the most direct targets of the anticompetitive acts. *Jeffrey v. Southwestern Bell*, 518 F.2d at 1131 (citing *Martens*); cf. *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1176 (5th Cir. 1976) ("[t]he key question" is whether plaintiffs themselves are within the target area, not whether they are "employees" of a business within the target area). There was no more direct target of defendants' alleged activity than FPC. Since the joint venture corporation was never formed, there is no possibility of double recovery. We hold that FPC has standing to challenge the alleged restraint in the harvesting business.[11]

Third, neither Indonesia Industrial nor Industrial Investment claims damages for injury to the value of its interest in another corporation. Each alleges injury by reason of a restraint on a business activity it claims it was preparing to enter.

Fourth, even if some of the damages from lost business claimed by Indonesia Industrial or Industrial Investment could be viewed as "deriving" from their relationship with FPC, it would not defeat their standing in this case. Each plaintiff alleges that it was plaintiffs' very competition that defendants were attempting to exclude. There is evidence in the record that supports these allegations, particularly the allegation that it was the American parent that defendants wanted to keep away from Indonesian timber. When a person is the direct target of an anticompetitive act, he has standing to sue for injury to his business. *See Perkins v. Standard Oil Co.*, 395 U.S. 642, 649–50, 89 S.Ct. 1871, 1875, 23 L.Ed.2d 599 (1969);[12] *Hayes v. Solomon*,

---

**10.** *Accord, Mendenhall v. Fleming Co.*, 504 F.2d 879 (5th Cir. 1974).

**11.** We do not thereby hold or imply that the Indonesian harvesting business is, in itself, within the reach of the antitrust laws. Whether plaintiffs can prove an injury within the extraterritorial scope of the Sherman Act awaits factual development in the trial.

**12.** In *Perkins*, Perkins sued not only for damages to his two corporations—which had assigned their claims to him, *see* 396 F.2d 809, 813–14 (9th Cir. 1967)—but also for losses "that he as an individual had suffered . . . because the two failing Perkins corporations . . . were unable to pay him agreed brokerage fees . . . , rental on leases . . . , and other indebtedness." 395 U.S. at 649, 89 S.Ct. at 1875. The

597 F.2d 958, 981 (5th Cir. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).[13]

Finally, defendants' contention that plaintiffs would not have been engaged in the businesses they claim is not a "standing" argument; it is a request for summary judgment on the fact of injury. We simply note that even if defendants had asked for summary judgment on this ground, they would not be entitled to it. The evidence in the record is sufficient to raise a genuine issue of fact.

### C. *Antitrust Injury*

Defendants' argument that plaintiffs have no standing because they have not alleged "*antitrust* injury" misconceives both the holding of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. at 489, 97 S.Ct. at 697, and the nature of standing. *Brunswick* is not a standing case. In *Brunswick* the Supreme Court was reviewing a jury's award of damages after a full trial on the merits. Plaintiffs had alleged that defendant, a major manufacturer of bowling equipment, had violated the antimerger provisions of the Clayton Act, 15 U.S.C. § 18, by acquiring and operating bowling centers that had defaulted in paying for their equipment; plaintiffs' sole proof of damages was the profits they would have made had the defaulting competitors gone out of business. The Supreme Court held this basis of damages "inimical to the purposes" of the antitrust laws; those laws

were enacted to protect competition, while plaintiffs claimed injury because competition was not eliminated. *Id.* at 488, 97 S.Ct. at 697. The Court held that injury compensable under 15 U.S.C. § 15 must be

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* at 489, 97 S.Ct. at 697. The Court did not hold, however, that plaintiffs had no standing; it simply held that plaintiffs had failed to offer proof of "*antitrust* injury."[14] Indeed, the Court indicated that it would have remanded the case for a new trial had plaintiffs offered any proof of injury related to the anticompetitive effects of defendant's acquisition and operation of the competing bowling centers. *Id.* at 489–90, 97 S.Ct. at 698.

It is analytically unsound, we think, to consider the requirement of antitrust injury an additional component of the standing inquiry. Under traditional standing analysis, the court does not reach the substantive issues in plaintiff's complaint, *see* 13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3531, at 175–76 (1975); instead, the court assumes *arguendo* that plaintiff has pleaded and could prove a violation of substantive law, and asks only whether plaintiff has alleged

Supreme Court reversed the court of appeals' ruling that these losses were too indirect to be "injuries" within the meaning of 15 U.S.C. § 15. "It is clear ... that Perkins was no mere innocent bystander; he was the principal victim of the [antitrust violation]." *Id.* at 649, 89 S.Ct. at 1875.

**13.** In the pertinent part of *Hayes v. Solomon*, plaintiff rented its movie theatre to defendants, its competitors. Plaintiff alleged that the defendants thereafter had improved the quality of their own theatres while ruining the good will of plaintiff's theatre by exhibiting X-rated films there. 597 F.2d at 971. Defendants argued that since plaintiff was not engaged in the film exhibition business during the damage period, it had no standing, invoking the general rule that a landlord may not sue for injury to the business he rents to. While we acknowledged

that this principle was generally sound, we held it inapplicable because plaintiff had alleged "that the conspiracy was aimed at it; it was the alleged bull's-eye of the target. This alleged conspiracy was aimed at [it] as an eventual, inevitable competitor in the motion picture exhibition business ...." *Id.* at 981. Similarly, there is evidence in this record that defendants' conspiracy was aimed at Industrial Investment, the American parent, as defendants' "eventual, inevitable competitor."

**14.** *See* Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv.L.Rev. 1127, 1133 n.36 (1976) (concluding that plaintiffs in *Brunswick* were "clearly" within the "target area," but simply failed to prove the right kind of injury).

a concrete injury and a sufficient causal relationship between the injury and the violation. *See Warth v. Seldin,* 422 U.S. 490, 498–502, 95 S.Ct. 2197, 2205–07, 45 L.Ed.2d 343 (1975). To be sure, the doctrine of antitrust standing requires a closer look at the nature of defendant's alleged conduct and its relation to the alleged injury: the court must identify the affected area of the economy and determine whether the alleged injury occurred within that area. *Yoder Bros.,* 537 F.2d at 1360. A person may suffer a causally related injury and still not have standing because the injury is too far removed from the area of commerce "endangered by a breakdown of competitive conditions." *Jeffrey,* 518 F.2d at 1131. Like traditional standing analysis, however, the antitrust standing inquiry does not permit the court to resolve such substantive issues as whether plaintiff has alleged a violation of law and whether plaintiff has in fact suffered injury. *See Yoder Bros.,* 537 F.2d at 1359–60.

 The question whether plaintiff has alleged antitrust injury, by contrast, requires the court to look at the nature of the violation alleged and the injury that resulted and to determine whether that injury "flows from that which makes defendants' acts unlawful." *Brunswick,* 429 U.S. at

489, 97 S.Ct. at 697. This determination is one of substantive law; indeed, such an inquiry could encompass every substantive issue in the case. To call such an inquiry a determination of standing not only "invites confusion," Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977,* 77 Colum.L. Rev. 979, 996 (1977), but it drains the term "standing" of any meaning.[15]

 We think that this case illustrates the importance of keeping these doctrines distinct. "Standing" is generally understood as an issue to be resolved by the court which does not require the court to determine the legality of defendant's alleged conduct. In this case the defendants moved for summary judgment only on grounds, such as standing, that apparently would not require the court to determine whether the defendants had violated the Sherman Act. In their original submissions, defendants argued that plaintiffs did not suffer "antitrust damages" because they were not in the "target area" of the alleged violation; after our first remand, and on this appeal, they have argued that plaintiffs did not suffer "antitrust injury" because they cannot prove a violation.[16] Thus, advancing an umbrella concept of standing, they have attempted to transform

---

**15.** There is dictum in one of our previous cases indicating that "antitrust injury" is a component of "standing." *Donovan Constr. Co. v. Florida Tel. Corp.,* 564 F.2d 1191, 1192 (5th Cir. 1977) (per curiam) (affirming district court's finding at trial that defendant did not intend to enter the relevant market), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1878, 56 L.Ed.2d 389 (1978). Defendants rely on a similar dictum in *Hardwick v. Nu-Way Oil Co.,* 443 F.Supp. 940, 943 (S.D.Tex.1978), *aff'd,* 589 F.2d 806 (5th Cir.), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979). In reviewing *Hardwick,* however, we expressed no opinion on the district court's discussion of standing, assuming *arguendo* that plaintiff had antitrust standing. 589 F.2d at 807 n.3.

In *Guzik v. State Bar of Texas,* 659 F.2d 528 (5th Cir. 1981), we affirmed a grant of summary judgment because the record was "devoid of any evidence" suggesting that defendant State Bar of Texas had engaged in illegal price-fixing. *Id.* at 531. We labeled this conclusion, however, a determination of "standing." *See id.* at 530, 531.

While *Guzik* and *Donovan Construction* were both correctly decided, the standing language in *Guzik* and the dictum in *Donovan Construction* are inconsistent with the doctrine of antitrust standing as explained in *Yoder Bros.,* 537 F.2d at 1359–60.

We also recognize that two other circuits have held that antitrust injury is a component of standing. *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1234 (6th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981); *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 498–500 (9th Cir. 1977). But we disagree with their analysis.

**16.** Construing defendants' motion as one for summary judgment on the violation issue, we hold that it lacks merit. Defendants argue that plaintiffs cannot prove a violation of the Sherman Act under our decisions in *Northwest Power Prods., Inc. v. Omark Indus.,* 576 F.2d 83 (5th Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979), and *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245 (5th Cir. 1975). These decisions, which both involved a supplier's termination of a distributor,

the very nature of their motion for summary judgment.

Plaintiffs have standing to bring this suit.

## IV. *Forum Non Conveniens*

■ The district court agreed with defendants' contention that Indonesia was a more convenient forum for this Sherman Act suit. This conclusion was error. The common law doctrine of *forum non conveniens* is inapplicable to suits brought under the United States antitrust laws. *United States v. National City Lines, Inc.*, 334 U.S. 573, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948).

In *National City Lines*, the district court dismissed a case brought under §§ 1 and 2 of the Sherman Act on the ground that another United States district court was a more convenient forum. The Supreme Court reversed, holding that the venue provisions of 15 U.S.C. § 22 [17] leave no room for judicial discretion to apply the common law doctrine of *forum non conveniens*. *Id.* at 588, 68 S.Ct. at 1177. Defendants argue that *National City Lines* is distinguishable because it dealt with *forum non conveniens* "in a purely venue-related context." This argument is wrong for several reasons. First, it misstates the facts of *National City Lines*, which involved a dismissal, not a change-of-venue order. *Id.* at 577, 68 S.Ct.

at 1172. Second, it misconceives the holding of *National City Lines*, which was that 15 U.S.C. § 22 was a statutory elimination of judicial discretion concerning where the case should be tried. Third, it ignores the reasons behind that holding, which apply with even greater force to this case. Those reasons were (1) that Congress had enacted the broad venue provisions of 15 U.S.C. § 22 to leave the choice of forum, within certain bounds, to plaintiffs' convenience, *see id.* at 581–88, 68 S.Ct. at 1174–77; (2) that permitting the application of *forum non conveniens* "inevitably would lengthen litigation already overextended," *id.* at 589, 68 S.Ct. at 1178, a prophecy that has come to pass in this case; and (3) that the application of the doctrine would be difficult in antitrust cases, "in which the violations charged are nationwide or nearly so in scope and effect, and the defendants are numerous companies widely scattered in the location of their places of incorporation, principal offices, and places of carrying on business and participating in the scheme." *Id.* at 591, 68 S.Ct. at 1179. The holding and rationale of *National City Lines* apply fully to this case.[18]

■ Even without the authority of *National City Lines*, we would reach the conclusion that antitrust cases cannot be dis-

establish that the substitution of one competitor for another by means of unfair competition is not in itself a violation of the antitrust laws. Defendants argue that the allegations and proof in this case establish nothing more.

Whether conduct aimed solely at a competitor violates the Sherman Act depends upon the effect it has on competition in the relevant market. *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1350–51 (5th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981); *see Northwest Power*, 576 F.2d at 89. Plaintiffs alleged that defendants have monopolized the relevant market. Because defendants' original motion papers gave plaintiffs no notice that they would need to produce proof on the issue of violation, it is understandable that plaintiffs did not respond with an affidavit under Fed.R.Civ.P. 56(f) requesting a continuance of the motion pending further discovery to support their allegations of market effect. We will not allow defendants to change their grounds of motion while simultaneously resisting discovery of the facts relevant to their new ground. Summary judgment on the violation issue was improper.

17. Those provisions, taken from § 12 of the Clayton Act, remain unchanged today: "Any suit ... under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business ...." 15 U.S.C. § 22.

18. Defendants argue that the Supreme Court "effectively nullified" its holding in *National City Lines* by its second decision in that case, *United States v. National City Lines*, 337 U.S. 78, 69 S.Ct. 955, 93 L.Ed. 1226 (1949). Shortly after the Court's first decision, Congress, in an unrelated move, enacted 28 U.S.C. § 1404(a), which authorizes the district courts to "transfer any civil action to any other district or division" "[f]or the convenience of parties and witnesses." In *National City Lines II*, the Court, relying on the legislative history and the broad term "any civil action," concluded that the transfer statute applied to antitrust actions. 337 U.S. at 80–84, 69 S.Ct. at 956–58. The Court in no way questioned its earlier holding concerning the effect of 15 U.S.C. § 22 on com-

missed on the ground that a foreign country is a more convenient forum. Sections 1 and 2 of the Sherman Act do not by their terms purport to define civil obligations owed by one party to another; they make it felonious to restrain unreasonably or to monopolize the commerce of the United States.[19] The treble damages action created for "private attorneys general" by § 4 of the Clayton Act, while "designed primarily as a remedy," *Brunswick*, 429 U.S. at 486, 97 S.Ct. at 696, is designed at least in part to "penaliz[e] wrongdoers and deter[ ] wrongdoing." *Id.* at 485, 97 S.Ct. at 696. Since it is a well-established principle of international law that "[t]he Courts of no country execute the penal laws of another," *The Antelope*, 23 U.S. (10 Wheat.) 66, 123, 6 L.Ed. 268 (1825); *accord*, Restatement (Second) of Conflict of Laws § 89 (1971), we have little doubt that the Indonesian courts would quite properly refuse to entertain plaintiffs' Sherman Act claim. A dismissal for *forum non conveniens*, then, would be the functional equivalent of a decision that defendants' acts are beyond the reach of the Sherman Act.[20] Defendants cannot use the rules of *forum non conveniens* as a substitute for the rules concerning the extraterritorial application of the Act.

■ Defendants argue that, even if *forum non conveniens* does not apply to a

Sherman Act claim, the district court's dismissal of plaintiffs' nonfederal claim on grounds of *forum non conveniens* was not a clear abuse of discretion under the standards set out in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511–12, 67 S.Ct. 839, 844, 91 L.Ed. 1055 (1947), and recently applied in *Piper Aircraft Co. v. Reyno*, —— U.S. ——, ——, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981). But once it is concluded that the Sherman Act claim should not have been dismissed, the question is not whether, as an original matter, it would be more convenient to hear the nonfederal claim in Indonesia, but whether it would be more convenient to force the parties to litigate two suits, one on the antitrust claim here, the other on the tort claim in Indonesia. The answer in this case is an obvious one: dismissal of the nonfederal claim would be a clear abuse of discretion. Such a course would simply force the litigants to undergo twice all of the inconveniences posited by defendants.[21] To a great extent, the two claims involve the same events, evidence, and witnesses. It would be far more convenient to resolve both claims in one trial.

REVERSED and REMANDED.

mon law *forum non conveniens*. Since defendants can point to no statute authorizing dismissal of an action on *forum non conveniens* grounds, *National City Lines II* does not help them in any way.

**19.** For the text of §§ 1 and 2, see note 3 *supra*.

**20.** After this case was taken under submission, the Supreme Court decided *Piper Aircraft Co. v. Reyno*, —— U.S. ——, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), and held that "[t]he possibility of a change in substantive law" does not preclude a dismissal on grounds of *forum non conveniens. Id.* at ——, 102 S.Ct. at 261. That holding is not inconsistent with our analysis here. *Reyno* involved the civil obligations owed by one private party to another in a tort case; by contrast, a private antitrust suit is conceived as a part of the scheme of enforcement of statutes enacted to protect United States commerce. *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 342, 99 S.Ct. 2326, 2333–34, 60 L.Ed.2d 931 (1979). In *Reyno*, there was

no question that the doctrine of *forum non conveniens* was applicable; the only question was "the proper application of the doctrine." —— U.S. at ——, 102 S.Ct. at 261. In this case, the question is whether the doctrine should apply at all.

**21.** Defendants point to problems in translations and access to sources of proof. Since this case involves actors and evidence in Indonesia, Japan, and the United States, these problems will be encountered whether the nonfederal claim is tried here or in Indonesia. Much documentary proof has already been amassed here. Japanese witnesses will simply have to travel to two foreign countries if the case is split between the United States and Indonesia.

Defendants also assert that "expert witnesses on Indonesian law reside in Indonesia." We find it hard to believe that there are no experts on Indonesian law in this country.