**NORTH MISSISSIPPI COMMUNICA-
TIONS, INC., et al.,
Plaintiffs-Appellants,**

v.

**Douglas W. JONES, et al.,
Defendants-Appellees.**

No. 85–4196.

United States Court of Appeals,
Fifth Circuit.

June 27, 1986.

David J. Cocke, Memphis, Tenn., for plaintiffs-appellants.

Nat G. Troutt, Senatobia, Miss., for Jones & DeSoto Co. Tribune.

Robert J. Kelly, Hernando, Miss., for De-Soto Co. Bd. Supervisor, Renfro, Robinson, Wallace, Riley and Lloyd.

Wm. W. Ballard, Hernando, Miss., Lawrence J. Franck, John C. Henegan, Allen W. Perry, Jackson, Miss., for Hernando Bank, Ballard & Burnett.

Before GEE, RUBIN, and GARZA, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A newspaper and two of its employees fired a broadside of antitrust, civil rights, and pendent state tort claims against a bank, a competing newspaper, and a County Board of Supervisors. After the plaintiffs had rested their case in the bench trial, the district court dismissed all of their claims. We hold that the record supports the trial court's judgment dismissing the antitrust charges, but that the factual findings on the civil rights claim are insufficient for us to determine the basis for the court's dismissal. We, therefore, vacate the judgment in part, and remand for further proceedings.

I.

Pamela McPhail Ivy was the editor of a newspaper, the *North Mississippi Times*, which was owned by North Mississippi Communications, Inc. After being displaced as the dominant newspaper in the county, allegedly as a result of the events related below, Ivy and North Mississippi Communications sued their rival, the *DeSoto County Tribune*, its owner and editor, Douglas W. Jones (the *"Tribune* defendants"); the Hernando Bank and two of its principals, Steve Ballard and Richie Burnette (the "Bank defendants"); and the DeSoto County Board of Supervisors and its members, Will Renfro, Floyd Robertson, Johnny Wallace, James Earl Riley, and Eulo Lloyd (the "Board defendants"). They alleged violations of §§ 1 and 2 of the Sherman Act, civil rights claims under 42 U.S.C. § 1983, and state-law tort claims.

The *Times*, which had its office in Hernando, Mississippi, was the first weekly newspaper in DeSoto County, Mississippi. Ivy testified that, at its peak in 1977, the *Times* had between 4,500 and 7,500 paying subscribers, mostly in the western half of the county. Several thousand additional copies were distributed free of charge. The defendants challenged these figures, and the record reflects a wide range of plausible subscription figures based on different sources and methods of calculation. The court made no finding on this conflict-

ing evidence. The *Tribune* had a much smaller circulation of about 700 paying subscribers, most of whom lived in the eastern half of DeSoto County in the Olive Branch area. The actual number of *Tribune* subscribers was also contested and not resolved by the court. The testimony was consistent, however, that the *Times* was substantially larger than the *Tribune,* which the court described as a "fledgling newspaper." Because of their geographic separation, testimony suggested that the two newspapers may not have been in direct competition until this dispute arose.

Ross Franks purchased the *Times* in 1975, hired Ivy as editor and made her a shareholder. Two years later, the Hernando Bank began a publicity campaign to announce its new name, logo, and automatic teller machines. Although the Bank advertised in the *Times,* Franks, who owned an interest in a competing local bank, allegedly complained to state banking authorities about an impropriety in the ads. This angered the President of Hernando Bank, Steve Ballard, who stopped all further Bank advertising in the *Times.* The Bank then contracted with the *Tribune* to distribute free six-month subscriptions to all bank customers beginning January 1, 1978. The Bank would pay one-half of the subscription price for each free copy and in return would receive a free quarter-page ad each week. The value of the ads covered much of the cost of the free subscriptions. As part of their agreement, the bank required the *Tribune,* which had previously been called the *Olive Branch Tribune,* to change its name to the *DeSoto County Tribune,* and to provide distribution throughout the county. The Bank also loaned $60,000 to the *Tribune* for construction of a new building. No evidence suggested that the terms of the loan were more favorable than those given other borrowers.

In 1977 the *Times* began prorating its subscriptions so that all renewals would fall due the same day. Renewals could then be solicited through annual ads in the paper, avoiding the cost of individual bills. The *Times* chose January 1, 1978 as its renewal date, and announced its decision several months in advance. The Bank's free subscription campaign began on the same date. The plaintiffs contend that this timing was intended to prevent renewals and evidences an intent to monopolize the newspaper market by driving the *Times* out of business. This is the basis for their Sherman Act claim against the Bank and *Tribune.*

The effect of the free-subscription campaign was vigorously contested. The *Times* attempted to prove that the campaign reduced the number of its paid subscribers by sixty-five percent, its advertising revenues by thirty percent, and its value as a going concern by sixty percent. The *Tribune* offered financial statements showing that the *Times'* subscription income actually increased in 1978, and other evidence that any drop in the number of paid subscribers was attributable to factors other than the free *Tribune* campaign.

The only conclusion that can be drawn with assurance from the record is that the *Times'* financial statements, postal filings, tax returns, and estimates of paid subscribers are thoroughly inconsistent and unreliable. The trial court found "that not one scintilla of evidence was presented that any person stopped subscribing to the Plaintiff Times because of this alleged illegal agreement; nor did anyone testify they stopped advertising in the Times because of this agreement."

The *Times* also brings Sherman Act and § 1983 claims against the DeSoto County Board of Supervisors, based on a different set of facts. The county's general legal advertising, awarded by bid and paid for by the Board, had gone largely to the *Times* before 1977. In fact, the *Times* once sued to prevent the *Tribune* from being allowed to bid on these legal ads because the *Tribune* was not a "paper of general circulation." North Mississippi contends that the Board developed ill will towards the *Times* because of critical editorials and news stories concerning several Board members. Allegedly in retaliation, the Board switched

its advertising in large part to the *Tribune* and threatened other *Times* advertisers with a loss of county business unless they withdrew their ads. For the four years ending in September 1981, the county advertising favored the *Tribune* by almost six to one.

Soon after the Bank switched its advertising to the *Tribune*, unknown persons mailed a libelous letter to subscribers of both papers accusing Ivy of homosexual proclivities, Ross Franks of trying to gain control of the county, and the *Times* itself of trying to ruin the county.

The withdrawal of county advertising, the threats to other *Times* advertisers, and the libelous letter are the basis for the plaintiffs' charges that the Board conspired to violate the Sherman Act and retaliated against the *Times* for the exercise of its first amendment rights in violation of § 1983.

After four and one-half days of trial, the plaintiffs rested their case. All defendants moved for a dismissal or directed verdict, and the district court granted their motion. The court found that the address labels on the envelopes in which the libelous letters were mailed came from a subscriber list that the *Times* had given to the Board of Supervisors in order to qualify to bid for legal ads. The court specifically held, however, that the *Times* had failed to prove that any of the defendants had furnished the list to the author of the letter or were responsible for the mailing. The court made no finding concerning reasons for the shift in the Board's advertising or the testimony that certain Board members had threatened the *Times'* other advertisers. Without discussing the § 1983 claims, the court dismissed all of the claims against all of the defendants, stating only that the plaintiffs had failed to prove the existence of a conspiracy, or of a specific intent to monopolize, on the part of any of the defendants.

## II.

■ The district court granted a directed verdict, "viewing the evidence in a light most favorable to the plaintiffs and giving the plaintiffs the benefit of all favorable inferences." However, when a court renders judgment in a bench trial at the close of the plaintiffs' case, the judgment is properly denominated a dismissal under Federal Rule of Civil Procedure 41(b) because "upon the facts and the law the plaintiff has shown no right to relief."[1] On appeal, we may review it as a dismissal, however, even if the district court referred to it as a directed verdict.[2]

Under Rule 41(b) the district court need not have applied as lenient a standard as it did but, as the ultimate trier of fact, it was entitled to weigh evidence, make credibility judgments, and draw inferences unfavorable to the plaintiffs.[3] Its findings of fact are shielded by Federal Rule of Civil Procedure 52(a) and must be accepted unless clearly erroneous.

The plaintiffs seize on language in the trial court's oral opinion to argue that the court applied a standard requiring "clear and convincing evidence," rather than merely a preponderance of the evidence. Although the trial court used this phrase at one point, it appears that the court was simply trying to emphasize its specific finding that no evidence whatsoever linked any of the Board defendants to the libelous letter. Reviewing the opinion as a whole, it is beyond dispute that the judge applied a standard more favorable to the plaintiffs than was necessary. This error is harmless, and their complaint that the trial court applied too high a standard is unfounded.

---

1. Fed.R.Civ.P. 41(b).

2. *See James v. DuBreuil*, 500 F.2d 155, 156 n. 6 (5th Cir.1974); *Fidelity & Cas. Co. v. Key Biscayne Bank*, 483 F.2d 438, 439 (5th Cir.1973).

3. *Hersch v. United States*, 719 F.2d 873, 876–77 (5th Cir.1983); *Weissinger v. United States*, 423 F.2d 795, 798–99 (5th Cir.1970) (en banc); *Emerson Electric Co. v. Farmer*, 427 F.2d 1082, 1986 (5th Cir.1970); *Trask v. Susskind*, 376 F.2d 17, 19 (5th Cir.1967); 7 C. Wright & A. Miller, Federal Practice & Procedure § 2371 at 220 (1971).

## III.

We discuss the alleged violations of Sections 1 and 2 of the Sherman Act separately, noting that, while Ivy's standing as an individual to assert a Sherman Act violation is not clear, North Mississippi clearly has a right to sue.

### A.

Section 1 of the Sherman Act makes illegal "every contract combination ... or conspiracy in restraint of trade or commerce".[4] Plaintiffs argue that the free-subscription agreement between the Bank and the *Tribune* was designed to harm the *Times* and violates Section 1. They do not assert that the agreement is a *per se* violation of the antitrust laws, so its legality must be analyzed under the rule of reason.

As we stated in *Northwest Power Products v. Omark Industries*,[5] "To prove an antitrust violation under the rule of reason ... [a plaintiff] must show the defendants' conduct adversely affected competition." The Bank defendants argue that their agreement with the *Tribune* did not adversely affect competition but increased it, establishing two competitive papers of nearly equal size in place of the *Times'* "virtual monopoly." The district court failed to make any findings concerning the anticompetitive effect of the agreement, or the relative market shares of the two papers before and after the campaign. The court did find that the *Times* failed to establish that it had lost any subscriptions because of the agreement, and this finding cannot be reversed unless clearly erroneous. If the *Times* lost no subscribers, then, absent a detrimental effect on competitors, the agreement could not have had any anticompetitive effect. Although the court should properly have applied the rule of reason and made a finding as to whether the agreement promoted or suppressed competition, its findings are sufficient for us to make the necessary determination. In such a case, efficiency dictates that we not order a remand needlessly.[6]

The plaintiffs' principal basis for asserting damages is their argument that the district court should have inferred that an offer of free newspapers would inevitably have led those who pay for a subscription to another paper to stop doing so. But the conclusion does not necessarily follow as a matter of logic or empirical observation. The record shows that some persons preferred the content of one, or subscribed to both, newspapers. Moreover, both papers regularly gave away thousands of free copies each year, yet were also able to sell subscriptions.

Ivy testified that it was her impression that people stopped subscribing to the *Times* because of the *Tribune's* free campaign. The plaintiffs' expert witness testified to a marked drop in subscriptions, ads, and value as a result of the double impact of the libelous letter and the free subscription campaign. The expert was unable, however, to separate the effects of the letter from those of the free campaign.

On cross-examination, the defendants exposed a number of errors in the expert's reasoning. He had attempted to set the value of the *Times* on December 31, 1977 and again one year later. In each case, however, he used financial statements that ended with the conclusion of the *Times'* fiscal year the following May. Thus, his highest valuation of the paper, supposedly immediately before the free subscription campaign, actually was based on data that related to a time five months after the campaign had begun. The defendants presented evidence that, on a calendar year

4. 15 U.S.C. § 1 (1982).

5. 576 F.2d 83, 90 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *see also Industrial Inv. Co. v. Mitsui,* 671 F.2d 876, 890 (5th Cir.1982), *vacated on other grounds,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983).

6. *See Pegues v. Mississippi St. Emp. Svc.,* 699 F.2d 760, 766 n. 7 (5th Cir.1983), *cert. denied,* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1984); *Continental Oil v. Cole,* 634 F.2d 188, 191 (5th Cir.1981).

basis, subscription revenues actually increased in 1978, without a price change.

The *Times* also failed to separate the effect of its new renewal policy from the effect of the subscription campaign. Thus, the expert testified that, although renewals in January and February 1978 were the same as, or greater than, the same period in 1977, renewals fell off sharply thereafter and did not pick up again until the start of 1979. This pattern seems to be the obvious result of the *Times'* new policy that all renewals would become due in January, and it does not necessarily reflect the effect of the *Tribune's* campaign.

Evidence was adduced as to numerous personnel and financial problems that plagued the *Times* well before the events of this suit, potentially causing the paper's loss of revenue. Minutes of the *Times'* stockholders meeting, shortly after the free subscription campaign began, discuss its woes at length, but without any mention of the *Tribune's* or the Bank's conduct. The financial statements and subscription records of the *Times* were rife with inaccuracies. For example, the *Times* generally failed to segregate subscription revenue from other income, or to note on its subscriber list which subscriptions were paid and which were free or expired. We certainly cannot say, on the record before us, that the trial court was clearly erroneous in finding no evidence that the free subscription campaign injured the *Times* or affected its competitive position.[7]

Appellants also assert a Section 1 claim against the Board for an alleged conspiracy with the *Tribune*. The district court found no evidence of any agreement or conspiracy between these two defendants. The record adequately supports the judge's finding. We therefore affirm his dismissal of the Section 1 claim against all defendants.

## B.

Section 2 of the Sherman Act condemns three actions: monopolization, attempt to monopolize, and conspiracy to monopolize.[8] In the district court the only Section 2 claims asserted by the plaintiffs were attempt and conspiracy to monopolize. We therefore consider only these two charges.

To establish an illegal attempt to monopolize, a plaintiff must prove that the defendant (1) had the specific intent to monopolize, (2) took overt acts in furtherance of a scheme to monopolize, and (3) had a dangerous probability of success.[9] A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce.[10]

A specific intent to monopolize is an essential element of each of the two offenses. The district court expressly found that neither the Bank defendants nor the *Tribune* defendants had specific intent to monopolize. In doing so, the district court credited the testimony of the Bank defendants and the *Tribune* defendants that the free-subscription campaign was conducted for legitimate business reasons. That conclusion was for the factfinder, based on his assessment of the credibility of the witnesses.

Plaintiffs respond that the bank distributed free subscriptions only to its depositors and that there could not have been any

---

7. *Cf. Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383, 388 (8th Cir.), *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974).

8. 15 U.S.C. § 2 (1982).

9. *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 990 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984); *Dimmitt Agri Indus. Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 525 (5th Cir.1982), *cert. denied*, 460 U.S. 1080, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983).

10. *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed.2d 575 (1946); *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 796 (5th Cir.1983).

sound reason to advertise to existing clients. The Bank, however, described the objective of its publicity campaign as announcing its new corporate image and automatic cash machines. This was a plausible reason to communicate with those who were already customers. Whether other, more cost-effective, methods were available, such as enclosures in monthly bank statements, is a factor that may be considered, but is not determinative of the Bank's intent.

The plaintiffs argue that two cases, *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*[11] and *Morning Pioneer, Inc. v. Bismarck Tribune Co.*,[12] compel a finding that the blanketing of free newspapers establishes a specific intent to monopolize. Those cases hold only that blanketing, combined with other indications, will support an inference of intent to monopolize. They do not hold that blanketing, in and of itself, necessarily establishes the requisite intent. Moreover, both cases involved blanketing by a dominant newspaper in an attempt to drive its lesser competitors out of business. The distribution of free newspapers might, in such cases, support an inference of monopolistic intent while the same conduct here by a "fledgling newspaper" that seeks to enter a new geographic market would not require the same conclusion. Accordingly, the district court finding that the plaintiffs did not prove intent to monopolize is not clearly erroneous.

This finding makes it unnecessary for us to consider whether North Mississippi Communications established any of the other elements of either the attempt or the conspiracy claim. Without proof of intent, neither Section 2 claim can succeed. We therefore affirm the trial court's dismissal of these claims against the Bank and *Tribune* defendants. The court's finding that the Board did not conspire with the *Tribune* or the Bank requires us also to affirm dismissal of the Section 2 claim against the Board defendants.

## IV.

The plaintiffs proffered the testimony of Mrs. Ivy about what Ron Moody, the managing editor of the *Tribune*, told her that Steve Ballard, the President of Hernando Bank, had told him. Ballard supposedly told Moody that the *Times* would be out of business in three weeks, given the free subscription campaign and the defamatory letter. The plaintiffs proffered the statement as evidence of the Bank defendants' specific intent to monopolize.

■ The district court sustained a hearsay objection, and we find no abuse of discretion in this ruling.[13] Moody's statement does not so clearly demonstrate an illegal conspiracy as to be against his pecuniary or penal interest, as the plaintiffs contend.[14]

■ The plaintiffs' second argument is that Moody was "partially unavailable" and that the testimony was therefore admissible under Federal Rule of Evidence 804(a)(3) because, although he testified at trial, he stated that "the specific dialogue of this conversation has faded with the years." This rule makes hearsay testimony admissible if the witness testifies that he has no memory of the events to which his hearsay statements relate.[15] Moody did, however, remember the general subject matter discussed, and his lack of memory of the details is not sufficient to make the testimony admissible.[16] *United States*

11. 601 F.2d 48 (2nd Cir.1979)

12. 493 F.2d 383 (8th Cir.), *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974).

13. *See, e.g., Jon-T-Chem., Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1417 (5th Cir.1983).

14. Fed.R.Evid. 804(b)(3); *See Pink Supply Corp. v. Hiebert, Inc.*, 612 F.Supp. 1334, 1345 (D.Minn.

1985); *United States v. Alvarez*, 584 F.2d 694, 699–702 (5th Cir.1978).

15. S. Saltsburg & K. Redden, Federal Rules of Evidence Manual 650 (3d ed. 1982).

16. Fed.R.Evid. 804(a)(3). *Cf. Walden v. Sears Roebuck & Co.*, 654 F.2d 443, 446 (5th Cir.1981); *United States v. Amaya*, 533 F.2d 188 (5th Cir. 1978), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977).

*v. Davis,*[17] on which appellants rely, was decided on the different ground of 804(b)(1), which permits prior testimony, and is of no help to them here.

## V.

■ Asserting a claim for violation of their constitutional right to free speech, arising under 42 U.S.C. § 1983,[18] the plaintiffs contend that the Board defendants retaliated against them for publishing editorials and news stories critical of the Board and its members. They adduced testimony that, because the *Times* had exercised its first amendment rights, the Board defendants deprived the *Times* of valuable legal advertisements and threatened its other commercial advertisers. The plaintiffs testified at length regarding direct confrontations with Board members who stated or implied that the Board was attempting to punish the newspaper for its editorials.

In *Perry v. Sindermann,*[19] the Supreme Court held that government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests, especially, his interest in freedom of speech." Although the *Times* may have had no "right" to receive certain legal advertising from the County Board of Supervisors, it would violate the Constitution for the Board to withhold public patronage, in the form of its advertising, from the *Times* in retaliation for that newspaper's exercise of first amendment rights, or, in similar reprisal to threaten commercial advertisers with a loss of county business should they continue to advertise in the *Times.* To permit such actions would "allow the government to 'produce a result which [it] could not command directly,' "[20] that is, denying the *Times* business in retaliation for its protected speech.

The Board does not deny that it is an official body and acts under color of state law. The *Times'* allegations were sufficient, therefore, to support a § 1983 claim. The court found no proof of any link between the Board or its members and the libelous letter. This finding is not clearly erroneous. The letter, therefore, cannot support the *Times'* § 1983 claim. The district court's only other finding was that withholding the county's legal advertisements did not threaten to put the *Times* out of business. While perhaps relevant to the antitrust claim, this finding does not dispatch the § 1983 claim.

We must, therefore, remand the § 1983 claim for further findings. On remand, the court should determine whether, on the record before it, the § 1983 claim must be dismissed because of an absence of proof that (1) the Board denied some or all of its legal advertising to the *Times* in retaliation for the *Times'* critical news stories and editorials; (2) any Board member threatened the *Times'* advertisers for the same reason; and (3) these actions damaged the *Times.* If the district court determines that the record suffices to prevent the dismissal of the § 1983 claims, the court shall proceed with the further trial of the case.

For the foregoing reasons, we AFFIRM the dismissal of the Section 1 and 2 antitrust claims against all defendants, but we VACATE that part of the judgment dismissing the § 1983 claim and REMAND the case for findings of fact concerning that claim. The plaintiffs do not appeal, and we therefore do not address, the district court judgment dismissing their pendent state-law claims.

17.   551 F.2d 233, 235 (8th Cir.), *cert. denied,* 431 U.S. 923, 97 S.Ct. 2197, 53 L.Ed.2d 237 (1977).

18.   42 U.S.C. § 1983 (1982).

19.   408 U.S. 593, 597, 92 S.Ct. 2694, 1697, 33 L.Ed.2d 570 (1972).

20.   *Id.* at 597, 92 S.Ct. at 2697 (quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)).