**NORTH MISSISSIPPI COMMUNICATIONS, INC., et al., Plaintiffs,**

v.

**DeSOTO COUNTY BOARD OF SUPERVISORS, Defendant.**

**No. DC81–220–NB–O.**

United States District Court,
N.D. Mississippi,
Delta Division.

March 8, 1988.

David J. Cocke, Memphis, Tenn., for plaintiffs.

Robert J. Kelly, Hernando, Miss., for defendant.

## MEMORANDUM OPINION

BIGGERS, District Judge.

This case involves a small county newspaper, once influential and potent in its county but later devitalized and enfeebled by a combination of people, circumstances, and institutions it had sought to influence in order to maintain its own position of dominance in the county. In its later days before it was taken over by new owners, the newspaper fired a broadside of cannon fire at those it sought to hold legally accountable for its demise. Those receiving the fire were a fledgling newspaper from the other side of the county, a banking institution, the DeSoto County Board of Supervisors, and individual persons associated with those organizations. The volley of charges included violations of antitrust laws, civil rights laws, and state laws of libel.

After a bench trial the court dismissed the charges at the close of the plaintiffs' case for failing to present sufficient evidence to justify the allegations charged. The order of this court was affirmed by the appellate court[1] as to the dismissal of the antitrust and libel charges but the appellate court remanded the case back to the trial court for findings of fact on the claim brought against the DeSoto County Board of Supervisors under 42 U.S.C. § 1983. This court conducted a second trial and, after hearing testimony from the defendants in regard to the section 1983 claim and consideration of the briefs and memoranda submitted by the parties, the court is now rendering its findings of fact and conclusions of law. The only defendants now remaining are the Board of Supervisors of DeSoto County, Mississippi. Specifically, the plaintiff Times has alleged that the Board of Supervisors violated the Times' First Amendment rights by withholding newspaper advertising from the Times and giving it to its competitor, the Tribune, in retaliation of the Times publishing critical stories and editorials about the Board of Supervisors.

The plaintiff, North Mississippi Communications, Inc., was the owner of the North Mississippi Times newspaper, hereinafter referred to as the "Times," a weekly newspaper in DeSoto County. The DeSoto County Tribune, hereinafter referred to as the "Tribune," was another newspaper on the other side of the county but since its inception had been only a fledgling paper and never had sought to invade the area served by the Times or compete with the Times for the business of publishing county legal advertisements. When the fledgling Tribune began stretching its wings and submitted a bid to the county Board to publish county Board proceedings and legal advertisements, which are required by law to be published in a newspaper of the county, the Times did not take kindly to this

**1.** *North Mississippi Communications, Inc. v.* *Jones,* 792 F.2d 1330 (5th Cir.1986).

attempted invasion of its heretofore exclusive domain and in April, 1976, brought suit in state court to enjoin the Board of Supervisors from publishing any county notices in the Tribune, claiming that the fledgling was too small to meet the qualifications required to publish county legal notices. The Times' claim was rejected by the state court and, for the first time, DeSoto County had two newspapers rather than only one competing for the county's business.

The county's legal notices consisted of two types which are required by law to be published—(1) the monthly Board proceedings and (2) the notices advertising for bids on county purchases and county contracts. The Board determined that only the monthly proceedings were required to be placed with the lowest bidding newspaper. The other notices, which were more desirable from a newspaper's point of view because there were more of them, could be placed with any qualified papers at the Board's discretion. Before the Tribune was ruled qualified to publish the notices, the Times was the only paper in the county qualified to publish the notices and so received them all. Then the Times found itself having to compete with the new force. The financial amounts involved in publishing these legal notices were rather insignificant in the overall scheme of things. For the five and a half years which are the subject of this suit, the total amount of the Board's legal ads published in both newspapers totaled only approximately $4,600.00 a year.

Rejected by the state court in its attempt to maintain a monopoly on the county legal notices, the Times nevertheless was undaunted in its determination to prevail on this issue. So when the time came for the county to receive bids to publish the monthly Board proceedings, the Times, through its editor, bid zero dollars ($0.00) to publish the monthly proceedings. The editor of the Times later stated that it was her impression at the time that if her newspaper received the business of publishing the monthly Board proceedings, it would also get the better paying business of printing the legal notices; however, her impression was ill-founded. The Board decided it had the discretion to publish the legal notices in either of the two qualified papers regardless of who published the monthly Board proceedings and it began to grant this business to both papers. When the Times saw that its $0.00 bid on the Board proceedings was not going to result in the Times also getting all of the legal notices and the accompanying income, the Times notified the Board in writing on August 6, 1976 that it was withdrawing its agreement to print the Board's monthly proceedings and the Tribune could have the business. That notification was only a few months after the Times had agreed to make these publications.

The record shows that after the Tribune began successfully competing and receiving county business the personal relations between the members of the Board of Supervisors and the editor of the Times, already strained, rapidly deteriorated. The Times wrote castigating and critical articles and editorials about the Board and its members, as was its constitutional right to do. The record also shows that the Board began to allocate more of its legal notice business to the Tribune. In fiscal 1977, the amount of legal notice business was approximately equally divided between the Times and the fledgling Tribune. Again, in fiscal 1979, the Times attempted to secure the county's legal advertising business and again bid $0.00 to publish the monthly Board proceedings, but again after the Board accepted the bid of the Times to print the monthly Board proceedings, the Times withdrew its agreement and suggested that the Board give this business to the Tribune, which the Board quickly did.

At one point in 1978 a detestable and abhorrent letter was mailed to hundreds of persons in the county degrading and libeling the editor of the Times. The evidence shows that the names and addresses of the receivers of that despicable document were taken from a list of Times subscribers. The Board had asked the Times for such a list sometime before the mailing of the letter, but no evidence was presented at trial to prove with specificity who was responsible for these libelous acts. Many people could have had access to the list,

and there is no more evidence in the record to point to the Board than to other persons. Would that the plaintiff could prove the identity of the culprits. Punitive damages surely would lie.

After the scandalous letter was circulated, the editor of the Times on June 12, 1978 again wrote the Board and stated that due to the scandalous letter and her belief that the Board had some responsibility for the mailing of it and also due to her belief that the Board had placed pressure on some of the Times' advertisers to stop advertising in the Times that "... [t]he Times will not bid in the future on any legal notices under the present board or its attorney...." The court heard no evidence that the Board placed any persons under any pressure concerning advertising in the Times. In response to the Times' letter, the president of the Board wrote the editor of the Times asking her if "this mean[s] that the North Mississippi Times shall print no legal notices, whatsoever, that it receives from De-Soto County ...?" The Times did not respond to the query of the Board. In fiscal 1978, the Tribune received nearly all of the legal notice business of DeSoto County— $4,496.66 out of a total of $4,947.47. The last two years of the defendant Board's terms shows that the Tribune received the vast majority of the county's legal notice business.

■ The charges by the Times and the question to be decided by the court is whether the switch in allocating most of the county's legal notices from the Times to the Tribune was done by the Board as a retaliation against the Times because of its printing critical stories and editorials about the Board, or whether it was done for other reasons. Clearly, the Board cannot legally punish a newspaper by withholding public advertising from it in retaliation for the newspaper's expressing its constitutional right of free speech under the First amendment. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). If the claims of the Times against the Board are proven by the preponderance of the evidence, then the Board is guilty of violating 42 U.S.C. § 1983 which prohibits

any person, under color of state law, to subject "any citizen ... to the deprivation of any rights ... secured by the Constitution...." Obviously, the record shows the Times to have received the lesser amount of the county advertising business during the four years of the defendant Board's tenure—only approximately 28%. The court is of the opinion that, contrary to the testimony of some of the individual supervisors, some of the supervisors did feel anger toward the editor of the Times for the highly critical stories and editorials published about them; however, the question at issue is what was the intent of the Board in allocating a greater share of the county advertising business to the Tribune than to the Times. Was it as a retaliation for the harsh articles about the Board or were there other factors that controlled? The court is of the opinion that even though a prima facie case of a constitutional violation was presented in the plaintiff's case in chief, the rebuttal evidence of the Board was just as persuasive that other legitimate reasons existed for favoring the Tribune over the Times.

Looking at the numbers involved during the five and a half years testified about, the Tribune received $18,338.92 in county advertising and the Times received $7,024.44. If the county advertising had been divided equally between the two publishers, each would have received approximately $12,680.00 or $2,305.00 per year. The Times did receive $1,277.00 a year on average. If the Board had as its motivation the punishment of the Times, it could have done a better job by not giving the Times any discretionary advertising. To a newspaper, $1,000.00 per year loss in gross proceeds is not much, if any, of a punishment.

The Times had been getting all of the county business before the fledgling Tribune began bidding for a share. It is clear from the record that the Times did not want the Tribune to have any county business at all. It went to court claiming the upstart Tribune was too small to meet the qualifications for printing county business. When it lost that claim, it submitted a bid to print the monthly Board proceedings for

$0.00 thinking it would thereby receive the remainder of the county legal notice business. That was the second tactic by the Times to prevent the Tribune from receiving any share of the country business. When that tactic did not work and the Tribune still received some county advertising, the Times withdrew its agreement, which had already been accepted by the county, and refused to continue printing the monthly Board proceedings in accordance with its bid. The Tribune was then given the business of publishing the monthly Board proceedings. Evidently, the Times at the next bid date in 1978 again submitted a bid to publish the monthly Board proceedings at no cost and again by letter a short time later informed the Board that the Times would no longer publish the proceedings as agreed and suggested the Board have its proceedings published in the Tribune, which the Board did. These actions on the part of the Times could easily have been perceived by the Board as evidence of unreliability in carrying out the publishing agreements entered into by the Times with the Board, and would in and of themselves justify a caution and perhaps a preference by the Board as to where its discretionary ads were to be published.

In the 1978 letter, the editor of the Times also accused the Board of pressuring the Times' advertisers not to advertise in the Times. The Board wrote the Times a response to that letter asking that the charges be made more specific but no reply was received from the Times.

■ The court is of the opinion that business experiences such as those described above would justify the Board in placing more of its discretionary legal notices in the Tribune than in the Times, and is just as likely a reason for so doing as the claim of the plaintiff that the Tribune was favored in order to punish the Times for its criticism of the Board. Let it be remembered that the Times tried three times to prevent the Tribune from having any of the county business, once going so far as to seek an injunction in court against the Tribune. After the injunction attempt failed, the Times and the Tribune received approximately an equal share of the county business during that fiscal year; but the Times was still dissatisfied with this arrangement and refused to print any more of the county Board proceedings even though it had made a bid to do so and the bid had been accepted by the Board. From that time on, the Board allocated approximately 72% of its business to the Tribune and 28% to the Times. The court cannot look into the minds of the Supervisors and see what their intent was in allocating the ads as they did. Intent can only be inferred by one's actions. There is a possibility that the Board wished to retaliate against the Times for its editorial positions. Such a feeling certainly would not be surprising considering the circumstances, although to act out that feeling would have resulted in a constitutional deprivation; however, the court cannot say that the evidence preponderates toward that finding. The other reasons for favoring the Tribune heretofore described appear just as probable. There was also some testimony that the Board left the task of placing legal notices to the clerks of the Board. There is also convincing evidence that a majority of the Board members whom the Times complained about most vociferously had already left the Board when the Tribune was receiving the major portion of its advertising from the Board. The record is clear that the Times did not want to share the county business with the Tribune. The Times wanted it all and, when it failed to get it all, it charged the Board had violated its First Amendment rights.

Accordingly, the charge of depriving the Times of its First Amendment rights under 42 U.S.C. § 1983 will be dismissed. An order will issue accordingly.