ROY NOBLE LEE, Chief Justice,
for the court:
On February 27, 1986, Union County General Hospital filed suit in the Chancery Court of Union County against Bettye Wicker (Wicker), a certified registered nurse anesthetist (CRNA), Drs. E.E. Bram-litt, Bruce Bullwinkel, and the New Albany Surgical Group, P.A., seeking to determine whether Wicker would practice in the hospital without a contract or agreement with the hospital and, if the court held that she could practice without a contract, asking that the chancellor declare the hospital’s liabilities for her acts. The lower court declared that Union County General Hospi *298 tal has the right to control the services of anesthesia within the hospital and that Wicker has no right to practice therein without being an employee of, or under contract to, the hospital. The lower court further held that the hospital breached its contract for one month with Wicker and awarded her damages for that breach. Wicker has appealed from the judgment and the hospital has cross-appealed from the award of damages. Wicker assigns the following errors in the trial below:
I.
THE TRIAL COURT ERRED IN FINDING THAT UCGH IS EXEMPTED FROM STATE MONOPOLY OR ANTITRUST LAWS AND THAT WICKER HAS NO STAFF PRIVILEGES AND THAT WICKER HAS NO RIGHT TO PRACTICE AT UCGH WITHOUT BEING AN EMPLOYEE OR UNDER CONTRACT, AND DENYING WICKER FURTHER RELIEF.
II.
THE TRIAL COURT ERRED IN FINDING THAT WICKER WAS ENTITLED TO ONLY $10,392.00 IN DAMAGES FOR BREACH OF CONTRACT.
III.
THE TRIAL COURT ERRED IN FINDING THAT UCGH DID NOT INTERFERE WITH WICKER’S CONTRACTUAL RELATIONSHIPS.
IV.
THE TRIAL COURT ERRED IN FAILING TO ALLOW WICKER TO SUBMIT AN OFFER OF PROOF.
V.
THE TRIAL COURT ERRED IN ADOPTING ALMOST VERBATIM THE POST-TRIAL PROPOSED FINDINGS OF FACT SUBMITTED BY COUNSEL FOR UCGH.
VI.
THE TRIAL COURT ERRED IN FINDING THAT IT HAD JURISDICTION OVER THE SUBJECT MATTER.

Facts

Union County General Hospital (Hospital) is county owned and is governed by a seven-member board of trustees. It is the only hospital in Union County. The Hospital in 1986 was licensed for 125 beds, but additional construction, which was to be completed in 1986, would allow space for an additional 37 beds, a total capacity of 157 beds. Wicker is a Certified Registered Nurse Anesthetist (CRNA). She began working at the Hospital when it opened in 1966. For many years she was the principal provider of anesthesia services at the Hospital. All parties agree that Wicker is a very well qualified CRNA and has given long and dedicated service to the Hospital.
Beginning April 1,1971, through September 30, 1982, Wicker operated as an independent contractor, providing anesthesia services to patients at the Hospital as requested by surgeons and obstetricians. During this time, she functioned under a series of written and verbal agreements. On September 30, 1982, the Hospital and Wicker entered into a written contract. Among other things, the agreement provided that the Hospital would bill patients for supplies, use of facilities, equipment, as well as for her professional services. The Hospital would then remit to Wicker sixty percent (60%) of the amount the Hospital charged for her professional services. Wicker was to have liability insurance for not less than one million dollars. Under no circumstances would the Hospital pay Wicker less for her services than they were paying to other contracting parties for anesthesia. The contract was for five years and was subject to cancellation by either party on ninety (90) days written notice.
Dr. Thurmond Beasley, a dentist, also performed anesthesia services at the Hospital, but on a much smaller scale. The Hospital prior to the contract with Wicker had been paying Dr. Beasley one hundred percent (100%) of the amount it had billed *299 its patients for his professional services. The Hospital continued to pay him the 100% for the month of October of 1982. Thereafter, the Hospital paid him sixty percent (60%) of the charge billed to the patient for his professional services, in accordance with its contract with Wicker.
In September of 1984, the Hospital experienced a drop in patient census (average patient load) due to changes in Medicare and Medicaid payments. To adjust to the resulting decrease in income, the Hospital took steps to reduce hospital expenses. The Hospital renegotiated contracts with its pathologist and radiologist. In the fiscal year ending September, 1985, the Hospital’s net income exceeded expenses by $95,000. However, payments on bonds it sold to finance new construction were soon coming due.
The Board of Trustees, in reviewing financial data of the Hospital, determined the profit the Hospital was earning off the Anesthesia Department was not sufficient. The Hospital had billed $407,000 for anesthesia services but was only netting a $17,-000 profit. In 1985, the Hospital paid Wicker $211,000; in 1984, $200,000; and in 1983, $183,600.
On October 1, 1985, the Hospital gave Wicker the required 90-day notice to terminate her contract. The letter stated that it had become necessary to renegotiate certain professional service contracts and for that reason and no other was the notice given. The letter also stated:
Please be assured the Board holds Mrs. Wicker in the highest regard, professionally and personally, and wishes to retain her valuable services. The purpose of this notice is to initiate negotiations in order to reach a new contract before December 31, 1985, which will be mutually acceptable and serve the needs of all parties.
The Hospital proposed a contract to pay Wicker approximately $50,000 for her anesthesia services. On November 27, 1985, Wicker informed the Hospital that she did not wish to renegotiate her contract with the Hospital, but that, beginning January 1, 1986, she would practice anesthesia on her own for two doctors practicing at the Hospital: Dr. Bramlitt and Dr. Bullwinkel d/b/a The New Albany Surgical Group, and all other doctors who wished to use her services. Drs. Bramlitt and Bullwinkel performed approximately 80% of the surgery at the Hospital. Thereafter, the Hospital hired a full-time CRNA, Phillip Tho-mason, to begin work on January 1, 1986. His base pay was $50,000 plus additional pay for overtime. The Hospital also entered into a contract with Dr. Beasley to provide anesthesia services at the Hospital. The contract with Dr. Beasley guaranteed that if he made less than $15,000 in a year from anesthesia services the Hospital would make up the difference. This was to assure that he would receive enough revenue to cover his malpractice premium.
The Hospital soon became concerned with its potential liability if Wicker were held negligent while administering anesthesia in the hospital, and the Board consulted its attorney. Contractual agreements were drafted and proposed to all the physicians at the Hospital, who used Wicker’s services regularly. Drs. Creekmore, Cargile, Russell and Shirley signed agreements which provided that each physician would assume responsibility for Wicker’s acts when they used her services at the Hospital. Drs. Bullwinkel and Bramlitt initially refused to sign such an agreement. Negotiations between the Hospital and Wicker for her to perform anesthesia services for the Hospital and between the Hospital and Drs. Bramlitt and Bullwinkel to accept responsibility for Wicker’s possible malpractice continued through at least February 18, 1986. Apparently, if the Hospital could succeed in either negotiation its liability concerns would be settled.
Finally, on February 25, Drs. Bramlitt and Bullwinkel signed an agreement whereby they would hold the Hospital harmless against any claim arising out of their use of Wicker’s services. Dr. Bram-litt testified that he did not want to sign, but agreed to do so only to keep from being sued. The Board then presented Drs. Bramlitt and Bullwinkel with another agreement which in addition to holding the *300 Hospital harmless, also had a provision that Dr. Bramlitt would not sue the Hospital and the Hospital would not sue him for previous acts. He refused to sign the document.
On February 27, 1986, Union County General Hospital filed a complaint in Union County Chancery Court seeking a declaratory judgment against Bettye Wicker, Drs. E.E. Bramlitt, Bruce Bullwinkel, and the New Albany Surgical Group, P.A.

Law

I.
THE TRIAL COURT ERRED IN FINDING THAT UCGH IS EXEMPTED FROM STATE MONOPOLY OR ANTITRUST LAWS AND THAT WICKER HAS NO STAFF PRIVILEGES. AND THAT WICKER HAS NO RIGHT TO PRACTICE AT UCGH WITHOUT BEING AN EMPLOYEE OR UNDER CONTRACT, AND DENYING WICKER FURTHER RELIEF.
The Hospital filed a complaint for declaratory judgment for the purpose of determining whether or not Mrs. Bettye Wicker could sell her services and practice in the Hospital without a contract or agreement. Wicker filed a counterclaim charging that her former contract and contracts proposed by the Hospital violated Medicaid laws; that the Hospital had breached its contract with her by paying another anesthetist more than she was paid; that she has clinical privileges entitling her to practice as an independent; that the Hospital was in violation of the Mississippi Antitrust Laws and acted in a trust or combine in violation of Mississippi Code Annotated §§ 75-21-1, et seq. (1972). She sought antitrust damages and an injunction, damages for tor-tious interference with her contracts with physicians, punitive damages of $5,000,000 and $428,563.67 for breach of contract.
The chancery judge ruled that (1) the Hospital was exempt from state antitrust laws, and that there was no evidence it was guilty of any antitrust action; (2) that Wicker did not have the right to practice as an independent CRNA and that the Hospital could prohibit her from practicing unless she had a contract/agreement with the Hospital; (3) that the Hospital did not act arbitrarily or capriciously and had not violated Medicaid laws; and (4) that Wicker was entitled to $10,392.00 for breach of contract.
We are of the opinion that it is unnecessary to decide the question of whether or not the Hospital was exempt from state antitrust laws on this appeal, and we do not address that question, since we agree with the chancellor’s decision on other questions, and affirm the judgment of the court.
A.

If the antitrust laws of Mississippi were applicable to the Hospital, did it violate the statute?

Simply stated, this issue is whether or not Wicker proved that the Hospital either had attempted to monopolize or did monopolize the delivery of anesthesia services in the market area of Northeast Mississippi, i.e., the territory in which the Hospital operated or where its competition lay. Certainly, there was no evidence of a conspiracy or combination on the part of the Hospital with a third person. Mississippi Code Annotated § 75-21-1 (1972). In order to establish a prima facie case of a monopoly, Wicker was required to prove the product market (the product or service) and the geographic market. Ready Mix Concrete and Concrete Products Co. v. Perry, 239 Miss. 329, 123 So.2d 241 (1960). She failed to prove that the Hospital either attempted to, or did, monopolize the delivery of anesthesia services in a particular market. The evidence showed that the Hospital competes with a number of area hospitals for obstetrical and surgical patients (those who require anesthesia), including Northeast Mississippi Medical Center, which operates in Tupelo, approximately twenty miles away. Northeast is one of the largest hospitals in the state with fourteen (14) CRNAs and five (5) anesthesiologists on staff. The chancellor found that the Hospital serves patients not only in Union County, but in all surrounding *301 counties and that other hospitals in the area serve patients from Union County. The chancellor was not manifestly wrong in holding that the evidence shows that the Hospital did not monopolize the anesthesia practice nor has it attempted to do so. See Ready Mix Concrete and Concrete Products Co. v. Perry, 239 Miss. 329, 123 So.2d 241 (Miss.1960); Jefferson Parish Hospital District #2 v. Hyde, 466 U.S. 2, 14, 104 S.Ct. 1551, 1559, 80 L.Ed.2d 2 (1984); North Mississippi Communications, Inc. v. Jones, 792 F.2d 1330, 1335 (5th Cir.1986); Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., 531 F.2d 910, 919 (8th Cir.1976); Mullis v. Arco Petroleum Corporation, 502 F.2d 290 (7th Cir.1974).
Wicker failed to establish her antitrust claim.
B.

Did Wicker have staff privileges?

Wicker contends (1) that she had medical staff privileges or was entitled to them and (2) the chancellor’s ruling that the Hospital can discharge her at will without notice or hearing would deny her a property interest without procedural due process. She argues that when she went to work for the Hospital, and for each year during the next twenty (20) years, she submitted her credentials to the Hospital and its medical staff for review; her credentials went through the standard medical staff channels for review and approval; that they were reviewed annually, just as any other member of the medical staff; that, therefore, she was on the medical staff; and that she meets the requirements to practice her profession under state law and is certified by a state board, therefore, she is entitled to staff privileges.
The Hospital and medical staff bylaws make no provision for medical staff membership for CRNAs. The term “certified registered nurse anesthetist” is not mentioned. The Medical Staff Bylaws defines “medical staff” to “include all physicians and dentists who are privileged to attend patients in Union County General Hospital.” ' Article 7 of the hospital bylaws which provides for regulation for membership on the medical staff in Section 1, subsection (1), states “An applicant must be ... engaged in the practice of medicine or dentistry....” The list of medical staff states, “The above physicians and dentists are approved for patient care in the Union County General Hospital.” Wicker is not a physician or dentist and, therefore, does not meet the criteria to be on the medical staff of the Hospital.
Wicker contends that, as a board-certified nurse anesthetist, she is entitled to practice at the Hospital without an agreement by virtue of the fact that she is licensed by the State of Mississippi to practice her profession. She offers no authority for her position that the Hospital must let her practice there without a contract and against its will. In Lloyd M.D. v. Jefferson Davis Memorial Hospital, 345 So.2d 1046, 1048 (Miss.1977), this Court held that the Board of a Hospital is charged with making competent staff selections; that if staff selections are “administered with fairness, geared by rationale compatible with hospital responsibility and unencumbered with irrelevant considerations, a court should not interfere.” Id. We are of the opinion that Wicker is not entitled to work at the Hospital without an agreement. Otherwise, the Hospital would be unable to control employees and staff members. It is common knowledge that qualified physicians cannot, and do not, practice their profession in hospitals where they are not staff members, except by invitation and association with staff physicians on cases. If any CRNA or practitioner in other fields could walk into hospitals and practice their specialty without a contract or without even consulting with the hospital management, chaos would result.
Wicker contends that she was entitled to notice and a hearing before terminating her relationship with the Hospital. She has not demonstrated state law or agreement between herself and the Hospital which provides her with an entitlement to work at the Hospital. She voluntarily terminated her relationship with the Hospital on December 31, 1985. She was not on the medical staff of the Hospital and she was not *302 under contract. Therefore, we are of the opinion that the Hospital does not owe her a hearing or explanation prior to termination.
II.
THE TRIAL COURT ERRED IN FINDING THAT WICKER WAS ENTITLED TO ONLY $10,392.00 IN DAMAGES FOR BREACH OF CONTRACT.[1]
Wicker contends that she and Dr. Beasley were not paid the same amount for the month of October, 1982, only, and that they were, in fact, not paid the same for the period October, 1982, through December 31, 1985; that, as a result, she suffered damages in underpayments in the amount of $36,891.00; and that Dr. Beasley was paid for charity patients and she was not so paid, resulting in underpayments of $27,-705.00.
The hospital administrator testified that Dr. Beasley was paid paid 100% of his charges for the month of October, 1982, but at no time thereafter did they pay him 100%. Dr. Beasley testified that, as to charity payments, he worked for a surgeon who did almost no charity work and that he never knowingly charged for charity. We cannot say that the chancellor was manifestly wrong in finding that Wicker was underpaid only in the month of October, 1982, and that Wicker was not entitled to damages on the charity issue.
The Board of Trustees of the Hospital discussed making contracts with Wicker and Dr. Beasley on several occasions prior to making the contract with Wicker. The contract was effective for the month of October, 1982, which month the Hospital paid Dr. Beasley 100% for his services. The chancellor held that Wicker should have been paid 100% for that month, which would have amounted to $10,392.00. However, Exhibit 29 reflects that Wicker performed $940.00 in charity work for the month of October, and that the amount of the judgment, i.e., $10,392.00, should be reduced by $940.00, leaving a balance due Wicker of $9,452.00. The judgment of the lower court, therefore, is modified to that amount, which disposes of the cross-appeal.
III.
THE TRIAL COURT ERRED IN FINDING THAT UCGH DID NOT INTERFERE WITH WICKER’S CONTRACTUAL RELATIONSHIPS.
IV.
THE TRIAL COURT ERRED IN FAILING TO ALLOW WICKER TO SUBMIT AN OFFER OF PROOF.
V.
THE TRIAL COURT ERRED IN ADOPTING ALMOST VERBATIM THE POST-TRIAL PROPOSED FINDINGS OF FACT SUBMITTED BY COUNSEL FOR UCGH.
VI.
THE TRIAL COURT ERRED IN FINDING THAT IT HAD JURISDICTION OVER THE SUBJECT MATTER.
We have carefully considered all the other errors specifically assigned and find that there is no merit in them.
There being no reversible error on direct appeal, the judgment of the lower court is affirmed. On cross-appeal, the judgment of the lower court in the amount of $10,-392.00 is modified and judgment is rendered here for Wicker in the sum of $9,452.00.
AFFIRMED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL AND JUDGMENT MODIFIED AND RENDERED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.

. The cross-appeal filed by the Hospital will be disposed of in the discussion of this assigned error.